**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, et al., Defendants.**

**Civ. A. No. 83–3608.**

United States District Court, District of Columbia.

Jan. 30, 1984.

Laurence Gold, Washington, D.C., for plaintiffs.

Robert Damus, Atty., U.S. Dept. of Justice, Washington, D.C., for defendants.

Thomas M. Susman, Washington, D.C., for amicus curiae.

## MEMORANDUM

GASCH, District Judge.

The plaintiff has brought this suit to challenge certain regulations promulgated pursuant to the Service Contract Act of 1965 ("SCA"), 41 U.S.C. § 351 *et seq.* The plaintiff seeks a declaration that the regulations are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the SCA and asks the Court to enjoin their implementation.

The challenged regulations were to have gone into effect on December 27. The parties reached an agreement that the effective date for the regulations would be put off until January 27, 1984. In the interim the parties submitted cross-motions for summary judgment, and the Court scheduled and held an expedited hearing of oral arguments.

BACKGROUND

The Service Contract Act of 1965, as amended, 41 U.S.C. § 351 *et seq.*, establishes labor standards for the performance of any contract, the principal purpose of which is to furnish services to the federal government. Under the SCA, contractors must pay their employees minimum wages and fringe benefits determined by the Secretary of Labor to be prevailing rates for such employees in the community where

the contract is performed. 41 U.S.C. § 351(a)(1), (2).[1] Moreover, a contractor that undertakes to provide services previously provided under a covered contract may not pay less than the predecessor paid if the predecessor's employees were paid pursuant to a collective bargaining agreement. 41 U.S.C. § 353(c).

Section 7 of the SCA, 41 U.S.C. § 356, expressly exempts certain employees from the SCA's coverage. Included among the employees expressly exempt from the Act are those working under contract subject to the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.*, and employees working under any contract exempted by the Secretary pursuant to Section 4(b) of the Act, 41 U.S.C. § 353(b). Any work required to be done in accordance with the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.*, is also exempt. The Act authorizes withholding of accrued payments and contract termination in the event of violations, 41 U.S.C. § 352.

The plaintiffs present eight challenges to the new regulations. Six of these challenges address limitations the regulations impose on the Act's coverage. They challenge exclusion from the Act's coverage of service activities that are part of contracts whose principal purpose is not provision of services, sections 4.110, 4.132 48 Fed.Reg. 49777, 49783–84 (1983).[2] They challenge two regulations excluding from the Act contracts the principal purpose of which is sale of the removed structures and the principal purpose of which is the sale of timber, sections 4.116(b), 4.131, 48 Fed.Reg. 49779–80, 49783 (1983). They further challenge limitation of the Act's coverage to contracts performed significantly or substantially in the United States, sections 4.110–4.113, 48 Fed.Reg. 49777–79 (1983). Plaintiffs oppose a regulation that lists criteria for ascertaining when repair and overhaul of equipment rises to the level of "manufacturing," and thus is within the coverage of the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.*, and when it is merely service work, thus within the SCA's coverage, section 4.117, 48 Fed.Reg. 49780. The plaintiffs also object to an exemption in the regulations for contracts for commercial product support services of high technology companies. Sections 4.123(e)(1), (2), & (3), 48 Fed.Reg. 49781–82.

The plaintiffs have also raised two questions on regulations implementing the Act's "locality of prevailing wage" provisions. The plaintiffs object to the Secretary's two-step procedure for wage determinations when locality of performance is unknown at bidding, sections 4.3, 4.4, 4.53, 48 Fed. Reg. 49764–66 (1983). The plaintiff also objects to the Secretary's limiting the successorship provisions of Section 4(c) of the Act to situations where the successor performs in the same locality as the predecessor contractor, section 4.163(i), 48 Fed.Reg. 49789–90 (1983).

The plaintiffs argue that these regulations delete from coverage contracts previously consistently covered by the SCA and that no sufficient justification for that deletion has been demonstrated. The plaintiffs also contend that the Secretary has inappropriately relied on cost factors where the Congress has evidenced an intent that a statute be remedial. Plaintiffs object to the limitation of coverage to contracts performed substantially in the United States, section 4.112(b), 48 Fed.Reg. 49778 (1983), on the additional grounds that changes made in the section between announcement of the proposed regulation and promulgation of the final regulation violated the notice and comment provision of the Administrative Procedure Act ("APA").

STANDARD FOR REVIEW

▆▆▆▆ As an exercise of the broad power that Congress has delegated to the Secretary of Labor, these regulations are bind-

---

**1.** Contractors must also assure that no covered services are performed under unsanitary, hazardous or dangerous conditions, 41 U.S.C. § 351(a)(3), and must notify service employees when they commence work on a contract of the compensation required by the SCA. 41 U.S.C. § 351(a)(4).

**2.** All of the challenged regulations are to be codified at 29 C.F.R. Part 4.

ing as law unless "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Batterton v. Francis,* 432 U.S. 416, 424, 425–26 & n. 9, 97 S.Ct. 2399, 2404, 2405–06 & n. 9, 53 L.Ed.2d 448 (1977). Where an agency issues regulations to implement a statute, the question is not how the statutory terms should be interpreted but whether the Secretary's regulation is permitted by the statute's language. *Id.* at 424, 97 S.Ct. at 2404.

■ As two recent cases make clear, however, this deferential review standard does not mean the Secretary need not enunciate valid rationales for changing regulations. Most recently, in *ILGWU v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), the Court vacated a decision by the Secretary of Labor to rescind a regulation forbidding homework in the knitted outerwear industry under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219. The Court found that the regulation in question forbidding homework had been in effect for many years and embodied the agency's "informed judgment that restricting homework would best carry out the policy dictated by Congress" in the Act. At 815. The Court required a "'substantial and searching inquiry to ensure that the agency's decisions are the product of reasoned thought and based upon a consideration of relevant factors.'" *Id.* The Court found fault with the Secretary's recision because the record failed to show that the Secretary had considered alternatives less drastic than recision and why those alternatives were not preferable to complete recision.[3]

In its decision, the Court of Appeals relied principally on the recent Supreme Court case of *Motor Vehicle Manufacturers Association v. State Farm Mutual*

*Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Supreme Court in that case reviewed recision by the National Highway Traffic Safety Administration of a regulation requiring installation of passive restraints. The Court rejected the Motor Vehicle Manufacturers Association's argument "that recision of an agency rule should be judged by the same [lenient] standard a court would use to judge an agency's refusal to promulgate a rule in the first place." *Id.* 103 S.Ct. at 2866. The Court cited *Atchison, T. & S.F. R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), for the proposition that there is a presumption that Congressional policies can best be fulfilled if the "settled rule" is adhered to. 103 S.Ct. at 2866. The Court made clear that, despite the narrowness of the arbitrary and capricious standard, the agency must be shown to have examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between facts found and choice made. *Id.* at 2866–67.

■ The plaintiffs suggest that the regulations here at issue represent changes in settled interpretation of the SCA and are thus within the purview of these recent decisions. The Court agrees that several of the new regulations represent departures from past practices. Nevertheless, the Court finds that the language of the SCA and the scope and content of deliberations preceding the promulgation of the final regulations form a sufficient foundation for the regulations and indicate that the regulations were the product of reasoned consideration of available alternatives. The plaintiffs' requests for declaratory and injunctive relief must therefore be denied.

---

**3.** Another ground for the Court's decision to vacate was the unreasoned nature of the Secretary's prediction that an effective program for enforcement of minimum wage and other standards would be feasible if homework in the knitted outerwear industry were permitted. The Court found strong evidence, principally in the long-standing of the rescinded regulation, against the possible efficacy of such a program

and little countervailing evidence. The Court stated that the Secretary's *prediction* in such a situation is not immune from judicial review. *Id.* at 822. The Court also found the record to show the Secretary's finding that substantial curtailment of employment opportunities would result from continued restrictions to be based on an abbreviated and inadequate analysis.

## THE SERVICE CONTRACT ACT'S INAPPLICABILITY TO SERVICE SPECIFICATIONS INCIDENTAL TO CONTRACTS FOR PURPOSES OTHER THAN PROVISION OF SERVICES

Section 2(a) of the Service Contract Act, 41 U.S.C. § 351(a) *et seq.*, provides that "[e]very contract (and any bid specification therefor) entered into by the United States ..., the principal purpose of which is to furnish services in the United States through the use of service employees shall contain [certain minimum wage provisions and other protections]." The plaintiffs have raised the issue of whether the parenthetical language, "any bid specification" refers to individual line items that are principally for services in nonservice contracts or to the bid solicitation documents and the resulting contract as a whole. The language of the statute suggests to the Court that the parenthetical language is not intended to expand the Act's protections to include contracts, the principal purpose of which is not provision of services. Some regulations previously promulgated by the Department of Labor have taken both positions. *Compare* 29 C.F.R. § 4.132 (1968) *with* 29 C.F.R. § 4.111 (1968).

New sections 4.110 and 4.132, 48 Fed. Reg. 49777, 49783–84 (1983), provide that the SCA is applicable to a contract only if the principal purpose of the contract is to furnish services. The regulations thus limit the SCA's coverage to contracts the entire purpose of which is provision of services, and exclude from coverage services provided pursuant to line-items in non-service contracts. This interpretation resolves problems of inconsistency and multiplicity of interpretations that have characterized this provision of the SCA. It also is based on a proper understanding of the statute's language and legislative history.

The current regulations construing this section of the SCA are inconsistent. Current section 4.111 states that the SCA does not apply if a contract's "principal purpose is to provide something other than services ... and any ... services ... performed are only incidental to the performance of a contract for another purpose." Current section 4.132, by contrast, provides for SCA coverage of specifications for services in contracts where services and nonservices are combined into one contract. Current practice is that separate line items for services in contracts not principally for furnishing services are considered covered. 48 Fed.Reg. 49742 (1983). Because of ambiguity in the regulations, however, many contracting officers have not actually included the SCA requirements in nonservices contracts.

The language of the SCA does not support an application to service components of nonservices contracts. The language of the statute suggests that the parenthetical language refers to invitations to bid for the contract rather than to provisions within the contract itself. The statute requires that the solicitation documents for any contract contain the minimum wage and other provisions required by the statute so that bidders will be aware of these requirements in calculating their bids. Any other construction of the parenthetical provision makes it incongruous with the rest of the statute. The words "every contract" would become mere surplusage, since the parenthetical language would cover any specification of any contract. It would also mean that the phrase "the principal purpose of which is to furnish services" would modify "any bid specification" which would also make reference to the principal purpose of the contract itself meaningless.

The plaintiffs have argued that the definition of the word, "specification," found in the Federal Acquisition Regulations ("FAR"), 48 Fed.Reg. 42102 *et seq.* (1983), forecloses the construction the Court here adopts. According to the FAR a specification is "a description of the technical requirements for a material product or service that includes the criteria for determining whether these requirements are met." 48 Fed.Reg. 42155 (1983).[4] The Court

---

**4.** The Court notes that the FAR system was developed pursuant to Office of Federal Pro-

curement Policy Act of 1974. 48 Fed.Reg. 42102 (1983). Definitions provided in FAR thus are

views this definition as consistent with a construction of the statutory term "bid specification" to mean information given to the prospective bidders regarding what their bids must include.

The legislative history of the SCA supports the conclusion that the SCA applies only to contracts whose principal purpose is provision of services. The House Report, for example, states that "[t]he bill is applicable to advertised or negotiated contracts, in excess of $2,500, the principal purpose of which is for the furnishing of services through the use of service employees," and provides further that "[p]rovisions regarding wages and working conditions must be included in these contracts and bid specifications." H.R.Rep. No. 948, 89th Cong., 1st Sess. (1965).

Moreover, the language in the remainder of this section of the statute refers to "the contract" without any reference to line item specifications. The language of this provision indicates that the Act was intended to apply to entire contracts, not to individual line items in specification documents. The defendants' decision to restrict applicability to contracts the principal purpose of which is provision of services thus comports with the language of the Act.

## TIMBER SALE CONTRACTS CONSTRUED AS NONSERVICE CONTRACTS AND NOT COVERED BY THE ACT

A dispute exists over the extent to which the SCA covers timber sales contracts. The preamble to the regulations traces the course of this dispute from 1972 to the present. *See* 48 Fed.Reg. 49751–52 (1983). Current regulations provide that contracts for *clearing* timber are subject to SCA, but make no provision for *sales* contracts. 29 C.F.R. § 4.116(b). The Department of Labor has actually viewed timber sales contracts as within the SCA's scope.

The Department of Agriculture and Forest Service contested the contention that SCA covers sales contracts and therefore did not apply SCA standards to those contracts, arguing that application to sales

contracts improperly expands the scope of SCA beyond service contracts and is contrary to the statutory purposes of the National Forest Management statutes.

Section 4.131(f), 48 Fed.Reg. 49783 (1983), resolves this dispute. It provides that

Contracts under which the contractor receives tangible items from the Government in return for furnishing services (which items are in lieu of or in addition to monetary consideration granted by either party) are covered by the Act where the facts show that the furnishing of such services is the principal purpose of the contracts. . . . "[T]imber sales" contracts generally are not subject to the Act because normally the services provided under such contracts are incidental to the principal purpose of the contracts.

48 Fed.Reg. 49783 (1983). The regulations further provide that, where the principal purpose of the contract is to provide a service, such as removal of diseased or dead timber, the contract is covered by the SCA. Sections 4.111, 4.131, 48 Fed.Reg. 49777–78, 49782–83 (1983).

The regulation appears to the Court to be consistent with the statute's principal purpose language. Moreover, it represents a reasonable compromise to the divergent views taken by interested parties. Comments received during the course of the rulemaking ranged from the suggestion that all timber sales contracts be excluded from the SCA's coverage to the recommendation that all timber sales be included within the SCA's purview. 48 Fed.Reg. 49752. There is thus ample support for the exclusion of timber sales contracts not principally for the furnishing of services from the coverage of the SCA.

## CONTRACTS FOR PROPERTY DEMOLITION, DISMANTLING, AND REMOVAL (SECTION 4.116)

The new regulations divide property demolition, dismantling and removal contracts into two categories: those contracts the principal purpose of which is the sale of

not contemporaneous with the SCA which was enacted in 1965.

salvage and those the principal purpose of which is the furnishing of services through the use of service employees. *See* sections 4.116(b), 4.131(f), 48 Fed.Reg. 49779–80, 49783 (1983).[5] Only the latter are with the SCA's coverage.[6] The regulations provide that all the facts must be considered in determining whether the principal purpose is the furnishing of services.

In the past, demolition contracts, though labeled "sales," have been considered to be principally for removal services, thus covered. 48 Fed.Reg. 49745 (1983). The office responsible for most such contracts, however, that is the General Services Administration ("GSA"), has not actually applied the SCA to demolition contracts. The purpose for this regulation is to make the coverage under the regulations consistent with the SCA's coverage, thus limiting its purview to contracts whose purpose is provision of services to the government. The purpose of the new regulation is to assure consistency in the SCA's application. 48 Fed.Reg. 49745 (1983).

Comments in the process of rulemaking included that "while a contractor's primary interest may be the acquisition of salvaged materials, the Government's primary concern is to clear land or remove a building, and that the sale of any material, although it may be a substantial portion of the contract, is only of secondary interest." 48 Fed.Reg. 49745 (1983). The new regulations provide for a case-by-case determination of whether the generalization offered by the commentators applies. If the principal purpose is the sale of salvage, and services provided are only incidental, then the contract is not subject to the SCA.

The Court has already expressed its view that the SCA's coverage is intended to include only those contracts the principal purpose of which is provision of services. The new regulation simply mirrors the principal purpose language of the statute itself. It recognizes that a determination of principal purpose depends on all the facts. If the government's purpose is simply to sell surplus property and liquidate for salvage value, for example, this would indicate that the primary purpose is selling and not removal services. The regulations are consistent with the Act inasmuch as they provide simply that the principal purpose of the contract will govern whether it is covered by the Act.

## OVERHAUL AND MODIFICATION OF EQUIPMENT SUBJECT TO THE WALSH–HEALEY ACT (SECTION 4.117)

Although Section 7(2) of the SCA, 41 U.S.C. § 356(2), exempts from SCA coverage "any work required to be done in accordance with the provisions of the Walsh-Healey Public Contracts Act" ("PCA"), there has not until now been any successful delineation of the boundary between the two kinds of work, particularly in Defense Department contracts for jet engine overhaul and rebuilding. As a result, there has been considerable overlap between the two statutes. 48 Fed.Reg. 49746 (1983). Currently service employees under a given contract are covered by the PCA if their work is connected with remanufacture and by the SCA if their work is unconnected. This has been especially problematic where a contractor uses the same employees to perform the tearing down and the rebuilding, 48 Fed.Reg. 49746 (1983), and has made enforcement of both acts difficult. *Id.* The SCA would currently cover disassembly and the PCA would cover rebuilding in such cases were it not for an exemption from SCA coverage granted to the Department of Defense. This exemption was granted in 1978 for engine overhaul and modification contracts, pending development of the criteria contained in the chal-

---

**5.** Where the principal purpose of a contract for demolition, dismantling and removal is to prepare for further construction, then the dismantling may be covered by the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.* This category is already excluded from SCA coverage under Section 4.116(b) of the existing regulations.

**6.** Receipt of salvage by the contractor does not, alone, preclude the contract's characterization as a services contract.

lenged regulations. Sections 4.117, 48 Fed. Reg. 49780 (1983).

The new regulations "eliminate dual coverage of overhaul and modification contracts by establishing guidelines designed to determine at what point the work on equipment is so extensive as to constitute 'remanufacturing' subject to PCA only; where the work does not meet these guidelines, it is subject to SCA only." 48 Fed. Reg. 49746 (1983). The regulation provides that "routine maintenance, preservation, care, adjustment, upkeep, or servicing of equipment" is covered by the SCA. Section 4.117(b)(2), 48 Fed.Reg. 49780 (1983). Specific criteria for determining when equipment overhaul and modification are covered by Walsh-Healey include whether the overhauled item is to be disassembled to component parts, whether the parts are to be reworked or replaced, and whether the components will be commingled with existing inventory. Section 4.117(b)(1), 48 Fed.Reg. 49780 (1983). Overhaul and modification must be performed in a facility owned or operated by the contractor in order to be considered manufacture, thus covered by the PCA. Section 4.117(b)(2)(v), 48 Fed.Reg. 49780 (1983).

The plaintiffs argue that this regulation is invalid because major rebuilding should be considered provision of services and should thus be covered by the SCA. Several factors, however, lend weight to the conclusion that rebuilding or reconditioning of used equipment into nearly new machinery constitutes manufacturing. The plaintiffs argue that case law cited by defendants as support for the criteria selected should not be applicable here and that the criteria selected "defeat effective enforcement" because the extent of work needed on a piece of equipment cannot be ascertained prior to its disassembly.

Under the Fair Labor Standards Act, courts have held that rebuilding and reconditioning of used and worn out equipment

constitutes manufacturing as opposed to services, the latter being exempt from that Act. *See Schultz v. Jack Smith Automatic Transmission Services, Inc.,* 422 F.2d 104, 107–09 (4th Cir.1970); *Walling v. Roland Electric Co.,* 146 F.2d 745, 746–47 (4th Cir.1945), *aff'd,* 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946); *Guess v. Montague,* 140 F.2d 500, 503 (4th Cir.1943).[7] The plaintiffs dispute the applicability of the criteria in those cases to the present situation inasmuch as the FLSA was broadened by the decision to include rebuilding within the notion of manufacturing. Here the effect is to exclude the work from SCA coverage. Since Congress has provided coverage for both service employees and manufacturing employees, it appears to the Court that an objective standard is necessary to make this distinction. The manufacturing employees are intended to come within the reach of the PCA and not the SCA.

On the second point, the Court notes that the Secretary is, in fact, better equipped than the Court to determine the feasibility of the application of criteria developed, particularly where, as the plaintiff notes, the Secretary consulted with the major contracting agencies for their expertise. Moreover, the Court finds a qualitative difference between the unverified prediction deemed insufficient in *ILGWU v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), and the prediction sought to be made here. To "determine whether proposed work principally involves 'remanufacturing' ... prior to soliciting bids", *see* 48 Fed.Reg. 49747 (1983), will entail estimates of actual work to be performed, which estimates can be founded on the facts peculiar to the individual situation. The prediction at question in *ILGWU v. Donovan,* 722 F.2d 795 (D.C.Cir.1983), was a prediction of whether the employment conditions of a class of workers would remain regulable if they were permitted to work in their homes.

---

7. Analogous cases under the federal tax laws have reached the same conclusions on the distinction between manufacturing and services. See *Hartley v. United States,* 252 F.2d 262, 266 (5th Cir.1958); *Hackendorf v. United States,* 243 F.2d 760, 762–64 (10th Cir.), *cert. denied,* 355 U.S. 826, 78 S.Ct. 36, 2 L.Ed.2d 40 (1957).

The definitional criteria finally arrived at by the Secretary are supported by the classifications established by the Standard Industrial Classification Manual (SIC). This a standard government publication that defines industries in accordance with composition and structure of the economy for purposes of statistical reporting. The SIC states that "repair activities are classified as Services, except ... the rebuilding of machinery and equipment on a factory basis which [is] classified as manufacturing." SIC, 1972 Ed. at 58.

The plaintiffs have based a further argument on the language of the SCA to the effect that "any work" under Walsh-Healey is exempt from the SCA. They argue that this language precludes the defendants' providing that contracts *principally* for remanufacturing are subject to Walsh-Healey rather than the SCA. The plaintiffs point out that the remainder of exemptions from the SCA in 41 U.S.C. § 356 are for entire contracts, rather than just "work required to be done," and argue that the proposal to give a blanket exemption to Walsh-Healey contracts is impermissible under this language. By the statute's terms, however, a *contract* the whole purpose of which is Walsh-Healey work would not need to be listed in order to be excluded from the SCA, since its principal purpose is not provision of services. The language of Section 7(2), 41 U.S.C. § 356(2), thus simply deals with manufacturing aspects to service contracts.

THE "IN THE UNITED STATES" LIMITATION (SECTION 4.112(b) OF THE CHALLENGED REGULATION)

The SCA by its terms applies to every contract entered into by the United States the principal purpose of which is to furnish services in the United States through the use of service employees. 41 U.S.C. § 351(a). A question is raised regarding the construction of the terms "in the United States" in cases where contracts are performed partly within and partly without the United States. The regulation challenged by plaintiff is Section 4.112, 48 Fed. Reg. 49778. This section adopts an inciden-

tal test in construing this language. The regulation provides that contracts performed essentially outside of the United States with only an incidental portion performed within are not covered by the Act. Only those contracts "significant or substantial" portions of which are performed within the United States' geographic limits come within the Act.

The question raised is whether the "principal purpose" requirement extends to "in the United States" or only encompasses "furnish services." The current regulation extends coverage to contracts to be performed at least in part in the United States. The proposed regulations provided that, for a contract performed in part within and in part without the United States, any portion performed in the United States would be covered. 48 Fed.Reg. 49743–44 (1983). The Department of Defense reported anticipated difficulties in administering this regulation, where only a minor portion of the contract was to be performed within the United States. Other commentators sought a broadening of the SCA's applicability to all American flag ships operating anywhere. The final regulation, section 4.112, provides for coverage "if a significant or substantial portion of a service contract is performed within the statutory geographic limits of the United States and provides further that the SCA's standards must be observed with respect to that part of the contract services which is performed within these geographic limits ... and ... not ... to services furnished outside the United States." 48 Fed.Reg. 49778 (1983).

Although the plaintiff states that this interpretation is at odds with the statutory language, the Court does not discern this disparity. The Court reads the language, "the principal purpose of which is to furnish services in the United States" as limiting the SCA's coverage to contracts aimed principally at obtaining services the provision of which is to take place in the United States. A regulation requiring coverage only for services performed in the United States, pursuant to contracts for services

to be performed substantially within the United States, is entirely consistent with this language.

■ The plaintiff also argues that the changes occurring between proposal of the regulation and the promulgation of the regulation in final form violate Section 4(b)(3) of the APA, 5 U.S.C. § 553(b)(3). That section provides that general notice of proposed rulemaking shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." The purpose of the rulemaking process, however, is to generate comments that will permit the agency to improve on the tentative rule announced in the notice of rulemaking. *See Transpacific Freight Conference v. FMC,* 650 F.2d 1235, 1249 (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981); *Ethyl Corp. v. EPA,* 541 F.2d 1, 48 (D.C.Cir.), (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Plaintiff, Seafarer's International Union, however, expressly commented on the proposed retention of the regulation in its current form, recommending instead coverage of all contracts on American flag ships regardless of the actual place of performance. Plaintiffs thus had actual knowledge that the final regulation might deviate from the proposed regulation. *See Common Carrier Conference v. United States,* 534 F.2d 981, 982–83 (D.C.Cir.), *cert. denied,* 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976). The Court is satisfied that the procedures here followed met the requirements of the APA.

THE LOCALITY OF PREVAILING WAGE IN CASES WHERE PLACE OF PERFORMANCE IS UNKNOWN AT THE TIME OF BIDDING

The regulation here challenged pertains only to those few cases (less than one percent) where there is more than one locality in which a service contract might be performed. There currently is no regulation to guide agencies soliciting bids for contracts that could be performed wherever the successful bidder happens to operate. 48 Fed.Reg. 49738 (1983). Current practice is to make separate wage determinations for the area in which each prospective bidder is operating, when that can be determined before contracting. A nationwide, composite wage determination is used if the location of prospective bidders cannot be ascertained or prospective bidders are too numerous to permit pre-contract, bidder-by-bidder determinations.

The new regulation provides for a two-step procedure in these cases. The first step is the identification of prospective bidders and their localities. The second step is the issuance of a wage determination for each locality where there is a potential bidder. Where this procedure is impracticable, it may be replaced by a wage determination for composite localities.

The plaintiffs have argued that a single prevailing wage must be issued based on the locality of the contracting agency or a nationwide locality. They argue that the two-step procedure results in channeling contract awards to low-wage areas of the country. This concern was asserted during the rulemaking, and addressed in the Discussion of Final Rule. 48 Fed.Reg. 49738 (1983). The discussion recognizes that the legislative history does not "evidence a congressional intent that potential bidders in widely divergent locations should be subject to a single 'prevailing' wage standard for all communities across the country, each of which has its own distinct wage patterns." *Id.* The Court shares the view that a primary intent of Congress was "to prevent Government contracts from disrupting local wage standards." [8] The two step procedure is the only alternative that achieves localization. The Court disagrees with the plaintiffs' contention that the

---

8. This is evidenced both by the SCA's "locality" language and also by the Legislative history. *See, e.g.,* Remarks of Rep. O'Hara, Hearings on H.R. 1678 and H.R. 6088 before the Special Subcommittee on Labor of the House of Representatives Committee on Education and Labor, 88th Cong., 2d Sess. (1964), at 81 (describing intent of the bill to assure that government contract workers receive equal and not higher than the prevailing rate in the locality).

"Secretary failed to provide any explanation for his rejection of alternatives to adoption of the two-step procedure" since the alternative chosen most ably effectuates the apparent intent of the statute. The Secretary acted within his authority in deciding that wage determinations should be based upon the locality of the contracting party in cases where place of performance is uncertain at the time of bidding.

## APPLICATION OF THE SUCCESSORSHIP PROVISIONS OF SECTION 4(c) OF THE ACT TO ONLY THOSE SITUATIONS WHERE THE SUCCESSOR PERFORMS IN THE SAME LOCALITY AS THE PREDECESSOR (4.163(i))

The situation where a service contract may be performed in more than one place gives rise to a second locality issue addressed by the new regulations. Section 4(c) of the SCA, 41 U.S.C. § 353(c), provides that a contractor providing substantially the same services as were performed by a different contractor is bound to pay its employees at least as much as the predecessor paid its employees, if the predecessor paid its employees pursuant to a collective bargaining agreement. The SCA further states that the successor is bound by what his predecessor paid unless the Secretary determines that that amount is at variance with prevailing rates in the area. The new regulation provides that "[t]he successorship requirement of section 4(c) applies to all contracts for substantially the same services as were furnished under the predecessor contract in the same locality." 48 Fed.Reg. 49789–90 (1983). The plaintiffs argue that a successor contractor, regardless of where located, must pay the collective bargaining wages of the predecessor. Although the language of Section 4(c) does not specify that the successorship provision applies only to successors to contractors in that locality, the absence of that language does not preclude a construction that applies the section only in the same locality. Cf. *Building & Construction Trades Dept., AFL–CIO v. Donovan*, 712 F.2d 611, 617–18 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). Where, as here, the purpose and language of the statute as a whole stress the theme of comparability within the locality, the restriction is appropriate.

Comments in the history indicate that this section was designed to preclude a successful bidder's paying less to employees than they were receiving from the contractor's predecessor, the former employer.[9] The provision was inspired by a situation at Cape Kennedy, Florida, in which service workers experienced large pay cuts from collectively bargained rates when a successor contractor took over a service contract with NASA. The hearings and debates on the 1972 Amendments that added this provision to the statute, as well as the Senate Report, support the conclusion that the successorship provisions were intended to apply to successor contracts at the same location. The regulations reflect that apparent legislative intent.

## EXEMPTION FOR CONTRACTS FOR COMMERCIAL PRODUCT SUPPORT SERVICES OF HIGH TECHNOLOGY COMPANIES

The Secretary has promulgated a regulation exempting contracts for the services of automatic data processing, high technology, and certain business equipment product support services from the Act's requirements. Disputes first arose in 1977 about whether these groups should be covered by the Act. From 1979 to the present they have in fact been exempt under an interim variance. The variance provides that actual wages and fringe benefits paid by the government contractor are to be considered "prevailing," thus acceptable.

The new regulations at section 4.123(e)(1), 48 Fed.Reg. 49782, aim to settle the ongoing dispute over whether this class of contracts is covered by the act by exempting them pursuant to Section 4(b) of the Act, 41 U.S.C. § 353(b), which provides:

---

**9.** *See, e.g.,* Remarks of Senator Gurney, Hearings on S. 3827 and H.R. 15376 Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess. (1972) (discussing experience of employees at Kennedy Space Center).

The Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any and all provisions of this chapter (other than section 358 of this title), but only in special circumstances where he determines that such limitation, variation, tolerance, or exemption is necessary and proper in the public interest or to avoid the serious impairment of government business and is in accord with the remedial purpose of this chapter to protect prevailing labor standards.

The question for the Court is whether the exemption is proper under this section of the statute. There can be little doubt that the regulation comports with the requirements of this provision that any exemption be in accord with the remedial purposes of the Act. A number of facts led to the conclusion that this class of employees did not need the protections of the SCA and were not, in fact, subject to the kinds of difficulties Congress sought to protect against in the SCA. The industry is not conducive to "wage-busting," and thus not in need of protections geared toward preventing depression of wages through price competition for labor-intensive service contracts. It was expressly found that the interim variance had not had the effect of depressing wages for employees within the industry. By contrast, imposition of the SCA requirements on this class of workers would disrupt the well established "merit pay systems," that pervade this industry.

Consistent with the remedial objectives of the SCA, protective restrictions are imposed on employers within the exemption. The regulations require that workers working on government contracts must receive pay equal to that of workers on contracts with private organizations. This is expected to diminish the possibility that employers may cut workers' wages to obtain government contracts. The record also indicates that the exemption is necessary to avoid the serious impairment of government business. A significant segment of the ADP industry may cease to do business with the government if their contracts include SCA requirements. They cite a GAO report that refers to a specific instance where continued industry refusal to enter into contracts with SCA requirements would severely affect operations at the Department of the Army's Redstone Arsenal in Alabama and White Sands Missile Range in New Mexico. It was found that vital missions of other agencies would be disrupted if computers were not available as a result of manufacturers' refusal to accept service contracts. The Court finds that the regulation in question creates an exemption that comports with the purposes and language of the SCA.

CONCLUSION

As discussed above, the Secretary's rationales for the new regulations satisfy the Court that the regulations are the product of reasoned analysis and are consistent with the language and purpose of the SCA. The Final Regulatory Impact analysis does not demonstrate that the Secretary placed greater weight on economic factors than on SCA goals. On the contrary, the aim was to "improve cost-effectiveness of the Service Contract Act regulations and ... at the same time be consistent with the language and intent of the Act." Final Regulatory Impact Analysis at 1. For the foregoing reasons, judgment is hereby entered that the decision of the Secretary of Labor is upheld.