**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., Appellants**

v.

**Raymond J. DONOVAN, Secretary of Labor, et al.**

**No. 84–5072.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1984.

Decided March 22, 1985.

---

187. *See* 49 U.S.C. § 10925(e) (1982); *Global Van Lines, Inc. v. Interstate Commerce Comm'n,* 704 F.2d 829, 833–34 (5th Cir.1983).

332

Laurence Gold, Washington, D.C., with whom George Kaufman, Laurence J. Cohen, Terry R. Yellig, Robert J. Connerton, Linda Lipsett, Kathy L. Krieger, Wash-

ington, D.C., and Howard Schulman, New York City, were on brief, for appellants.

John C. Hoyle, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Anthony J. Steinmeyer, Atty. U.S. Dept. of Justice, Washington, D.C., were on brief, for appellees.

David S. Cohen and Tara Harvey, Washington, D.C., were on brief for Computer and Communications Industry Ass'n, amicus curiae, urging affirmance. Barbara A. Duncombe also entered an appearance for amicus curiae.

Thomas M. Susman was on brief, for Computer and Business Equipment Manufacturers Ass'n, et al., amicus curiae, urging affirmance.

Lawrence J. Latto and Patrick M. Hanlon, Washington, D.C., were on brief, for National Forest Products Association, amicus curiae, urging affirmance.

Before GINSBURG, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This action grows out of a rulemaking by the Department of Labor amending regulations which implement the Service Contract Act of 1965. 41 U.S.C. §§ 351–358 (1982) (as amended). Appellants brought suit in the United States District Court for the District of Columbia seeking an injunction against implementation of eight of the final rules. The District Court granted summary judgment in favor of the Secretary of Labor with respect to all eight rules. *See American Federation of Labor & Congress of Industrial Organizations v. Donovan*, 582 F.Supp. 1015 (D.D.C.1984). We affirm the District Court's judgment with respect to seven of the regulations but conclude that the adoption of the eighth was violative of the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553(b)(3) (1982).

I

A

The Service Contract Act (the Act) provided the third leg in Congress' support of labor standards in federal contracting. Workers on federal or federally funded construction contracts were already protected under the Davis-Bacon Act, 40 U.S.C. §§ 276a to 276a–5 (1982), which was enacted in 1931, while those performing work under federal supply contracts were protected under the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45 (1982), passed by Congress in 1936. Contracts for *services* to be provided to the federal government (and the District of Columbia) were perceived by Congress as the only remaining category of federal contracts in which no protection of labor standards existed; the Act, adopted in 1965, was aimed at providing that protection. *See* S.Rep. No. 798, 89th Cong., 1st Sess. (1965); H.R. Rep. No. 948, 89th Cong., 1st Sess. (1965), U.S.Code Cong. & Admin.News p. 3737.

By its terms, the Act applies to contracts in excess of $2,500 the principal purpose of which is the furnishing of services to the Government through the use of service employees. The Act mandates that such employees be paid no less than the rate determined by the Secretary of Labor to be the prevailing rate in "the locality." Any fringe benefits prevailing in "the locality" are also protected. Other provisions of the Act (1) prohibit payment of wages at less than the minimum wage; (2) require safe and sanitary working conditions; and (3) mandate notice to employees of benefits due under the Act. Penalties are provided for non-compliance. Finally, specific exemptions are carved out for contracts already covered by the Davis-Bacon or Walsh-Healey Acts or those falling into several other categories. The Secretary is also vested with authority to grant "variations, tolerances and exemptions ... [as he may find] necessary and proper in the public interest or to avoid the serious impairment of government business." 41 U.S.C. § 353(b).

The Act was amended in 1972, *see* Pub.L. No. 92–473, 86 Stat. 789 (1972), to correct perceived problems that had developed in the statute's administration. One purpose of the 1972 amendments was to assure that "employees working for service contractors under a collective bargaining agreement will have wages and fringe benefits under a new service contract no lower than those under their current agreement." S.Rep. No. 1131, 92d Cong., 2d Sess. 1 (1972), U.S.Code Cong. & Admin.News p. 3534. A second legislative purpose was to limit the Secretary's discretion in granting exemptions, variations and tolerances under section 353(b). *See* H.R.Rep. No. 1251, 92d Cong., 2d Sess. 3–4 (1972). This limitation on administrative discretion was accomplished by providing that the Secretary's authority was to be exercised only (1) in "special circumstances" and (2) when such an exemption, variation or tolerance would be in accord with the remedial purposes of the Act. *Id.* at 4–5.

The Act was further amended in 1976, *see* Pub.L. No. 94–489, to restore the *status quo ante* in light of the decision in *Descomp v. Sampson,* 377 F.Supp. 254 (D.Del. 1974). The *Descomp* court had held that "white collar" workers were not covered by the Act. Congress squarely rejected that position, amending the statute to make it clear that both "white collar" and "blue collar" employees are to be considered "service employees" within the meaning of the Act. *See* H.R.Rep. No. 1571, 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News pp. 5211, 5212.

The sections or subsections of the amended statute relevant to the inquiry at hand are codified at 41 U.S.C. §§ 351–358 (1982). In view of the pivotal importance of the statutory language itself, we set forth in the text which follows the pertinent parts of the measure:

§ 351. *Required contract provisions; minimum wages*

(a) Every contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States through the use of service employees shall contain the following:

(1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract ... as determined by the Secretary ... in accordance with prevailing rates for such employees in the locality, or, where a collective-bargaining agreement covers any such service employees, in accordance with the rates for such employees provided for in such agreement....

\* \* \* \* \* \*

§ 353. *Law governing Secretary's authority; limitations and regulations allowing variations, tolerances and exemptions; predecessor contracts, applicability; duration of contracts*

(a) Sections 38 and 39 of this title [discussed in the text which follows] shall govern the Secretary's authority to enforce this chapter, make rules, regulations, issue orders, hold hearings, and make decisions based upon findings of fact, and take other appropriate action hereunder.

(b) The Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions ... but only in special circumstances where he determines that such limitation, variation, tolerance, or exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of this chapter to protect prevailing labor standards.

(c) No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any pro-

spective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided*, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

\* \* \* \* \* \*

§ 356. *Exemptions*

This chapter shall not apply to—

(1) any contract of the United States or District of Columbia for construction, alteration and/or repair, including painting and decorating of public buildings or public works;

(2) any work required to be done in accordance with the provisions of the Walsh-Healey Public Contracts Act;

41 U.S.C. §§ 351, 353, 356. Section 38, incorporated by reference in section 353(a) (quoted on the prior page), grants the Secretary of Labor authority to make, amend and rescind rules and regulations necessary to carry out the provisions of the Walsh-Healey Act. *See* 41 U.S.C. § 38. Equivalent powers to those enjoyed under Walsh-Healey are therefore granted to the Secretary under the Service Contract Act.

**B**

Regulations implementing the Act are set forth in 29 C.F.R. Part 4. The regulations are voluminous, covering almost eighty pages in the Code of Federal Regulations. On December 28, 1979, the Labor Department issued a notice of proposed rulemaking to carry out, by its terms, the first "[t]horough substantive updating and clarification [of the regulations] . . . since 1969 . . . ." 44 Fed.Reg. 77036, 77036 (1979). The changes were intended (1) to reflect interpretations developed over the

years within the Department and (2) to address concerns raised by various contracting agencies about the coverage and operation of the Act. *See id.* The comment period was extended on no fewer than seven occasions between February and October 1980, and a "final rule" was issued on January 16, 1981. *See* 46 Fed. Reg. 4320 (1981). Meanwhile, an additional clarification was proposed on December 12, 1980, *see* 45 Fed.Reg. 81785 (1980), and a clarifying "final rule" issued on January 19, 1981, *see* 46 Fed.Reg. 4886 (1981). Implementation of the "final rules" was then delayed on several occasions in early and mid-1981. *See* 48 Fed.Reg. 49736, 49736 (1983). On August 14, 1981, the effective date of the rules was once again postponed, *see* 46 Fed.Reg. 41380 (1981). After a final extension of the comment period, *see* 46 Fed.Reg. 50397 (1981), the regulations that form the basis of this litigation were eventually adopted on October 27, 1983, effective December 27, 1983. *See* 48 Fed.Reg. 49736 (1983).

During this extended period, approximately 1600 interested parties submitted comments to the Secretary. Included among the 1600 commenters were at least seven of the nine appellants in this action.[1] Comments were also received from Members of Congress, contracting agencies, contractors and contracting associations, business organizations, other labor organizations, and individuals. *See id.* at 49736–37.

Of the twenty-six rules adopted, eight came under fire and are the subject of this appeal. The first, amending 29 C.F.R. §§ 4.3, 4.4 and 4.53, concerns the determination of the "locally prevailing wage" when the contractual place of performance is unknown at the time of the agency's bid solicitation. This issue arises when a service contract entered into by the Government can be performed at any location of the contractor's choosing, rather than at a single specific location. In the challenged regulation, the Secretary determined that,

---

**1.** The record is unclear as to whether the two remaining appellants provided comments.

rather than issuing a single nationwide determination of wages for all bidders, he would issue instead wage determinations under a two-step process. Initially, the agency would identify prospective bidders and their localities. After completion of this first stage by the contracting agency, the Secretary would then issue a wage determination for the locality of each bidder.[2]

The second contested regulation amended 29 C.F.R. §§ 4.110 and 4.132. The subject matter addressed by that regulation was the class of contracts that, taken as a whole, do not have as their principal purpose the provision of services, but that contain separate contract specifications principally for services. The Secretary determined that the Act did not apply to individual specifications for services within a contract, when the contract itself was not principally for services.

The third rule, amending 29 C.F.R. §§ 4.110–.113, concerned contracts performed partly within and partly outside the United States. The Department of Labor adopted a "significant or substantial" place-of-performance standard for determining whether a contract is performed "in the United States" and thus within the scope of the Act. *See* 41 U.S.C. § 351(a). If only a minor or incidental portion of the services was to be performed in the United States, then the contract, under the revised regulation, would not be covered.

The fourth regulation amended 29 C.F.R. §§ 4.116(b) and 4.131(f). Under the revised regulation, in instances where a contract was to be entered into for the demolition, dismantling and removal of federal property, the contract would not be within the scope of the Act, *if* the principal purpose of the contract were the sale of the salvaged material and the services provided by the contractor were only incidental to that sale. If, on the other hand, the Government's principal purpose in contracting were to obtain demolition and removal services, the contract would be covered under the Act,

even if the contractor took ownership of the salvaged materials. Finally, if further construction were contemplated, the contract would be subject to the Davis-Bacon Act and therefore exempt from the Service Contract Act.

Rule five, amending 29 C.F.R. § 4.117, concerned the overhaul and modification of aircraft engines and other equipment. This type of activity involves both service work in the removal and dismantling of the equipment and, at a later stage, Walsh-Healey work in the rebuilding or remanufacture of the equipment. The revised regulation established guidelines for determining when work on equipment becomes so extensive as to constitute remanufacturing and thus subject to Walsh-Healey. If the work does not fall within the guidelines, the activity would be deemed to be repair or other service work subject only to the Service Contract Act. Where the guidelines were met, however, the work would be deemed remanufacturing subject only to Walsh-Healey.

The sixth regulation amended 29 C.F.R. §§ 4.123(e)(1), (2), and (3) by providing an exemption for contracts for the maintenance and repair of certain automated data processing equipment, scientific and medical apparatus, and office and business machines. Under the regulation, this exemption would be granted only (1) when the equipment being serviced is also furnished commercially to non-government users; (2) the price for the services is based on established catalog or market prices; and (3) employees working on federal contracts are paid under the same compensation plan as employees of the contractor who work on commercial contracts.

The seventh rule, amending 29 C.F.R. §§ 4.130(a) and 4.131(f), provided that contracts for the sale of timber would no longer be covered under the Act. While such contracts generally include provisions requiring the building of temporary roads and the performance of fire prevention and erosion control activities, the new regula-

---

**2.** The amended regulation, as promulgated, also provided an alternative procedure for extraordi- nary situations in which the two-step process was impractical.

tion provided that none of the work would be covered by the Service Contract Act where the principal purpose of the contract was for the sale of timber. On the other hand, contracts principally for the clearing of land for the purpose of providing recreational facilities or eliminating diseased trees, etc., would remain covered by the Act.

The last contested regulation amended 29 C.F.R. § 4.163(i). The 1972 amendments to the Service Contract Act, which we have already mentioned, had required that employees working under a collective bargaining agreement receive at least the same wages and fringe benefits under a new service contract as those obtaining under the collective bargaining agreement. Under the revised regulations, the successorship provision is to apply only where the successor contractor performs the services in the same locality as the predecessor contractor.

### C

Appellants here are the American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO"); Building and Construction Trades Department, AFL–CIO; International Association of Machinists and Aerospace Workers, AFL–CIO; International Brotherhood of Electric Workers, AFL–CIO; Laborers' International Union of North America, AFL–CIO; Seafarers' International Union of North America, AFL–CIO; Transport Workers of America, AFL–CIO; and United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("appellants" or "Unions"). In their suit, the Unions sought a declaratory judgment that the regulations which we have just described were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, as well as an order enjoining their implementation. *See* First Amended Complaint for Declaratory and Injunctive Relief ("Complaint"), *reprinted in* Joint Appendix ("J.A.") at 33. Appellants also asserted that the amended regulation embracing a "significant or substantial" standard for contract performance "in

the United States" was invalid on the additional ground that the change was made in violation of the notice-and-comment requirements of section 4(b)(3) of the APA. *See* Complaint at ¶ 26, *reprinted in* J.A. at 43.

Emphasizing the broad powers delegated by Congress to the Secretary under the Act, the District Court concluded as to the standard of review that the challenged regulations would be sustained unless their adoption was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *AFL–CIO v. Donovan, supra,* 582 F.Supp. at 1018 (quoting *Batterton v. Francis,* 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977)). The court went on to find that "the language of the [Service Contract Act] and the scope and content of deliberations preceding the promulgation of the final regulations form a sufficient foundation for the regulations and indicate that the regulations were the product of reasoned consideration of available alternatives." *Id.*

With regard to the alleged violation of the APA's notice and comment provisions, the court observed that the essential purpose of those provisions is the generation of comments that will permit the agency to improve its tentative rule announced in the notice of proposed rulemaking. While the Unions contended that inadequate notice was provided to the effect that the regulation interpreting "in the United States" would be changed, one litigant, Seafarers' International Union, the court emphasized, had expressly commented on this regulation. From that comment by one of the plaintiffs, the court found that "[p]laintiffs ... had actual knowledge that the final regulation might deviate from the proposed regulation," *id.* at 1024, and that the procedures followed by the Secretary satisfied APA requirements. The District Court went on to grant summary judgment in favor of the Secretary on all counts.

### II

■ We first address appellants' contention as to the alleged inadequacy of notice

of the Secretary's change of the interpretation of contract performance "in the United States." If there was inadequate notice, this specific regulation must fall on procedural grounds, and the substantive validity of the change accordingly need not be examined. Upon analysis, we agree with appellants' claim that no effectual notice was given of this modification.

## A

Section 4(b)(3) of the APA, 5 U.S.C. § 553(b)(3), provides as follows.

General notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

\* \* \* \* \* \*

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

There appears to be no dispute over the applicability of the notice-and-comment requirement to the contested regulation. Rather, the dispute centers on whether the notice set forth in the notices of proposed rulemaking was adequate.

The Secretary argues that the amended regulation evolved from the initially proposed regulation. That initial proposal would have continued the provision in the former regulations that, if a contract was performed partly within and partly without the United States, the part performed within the United States would be covered under the Act. No "substantial performance" test or similar standard existed. The change to the proposed rule, as adopted, grew out of competing suggestions received during the comment period.

■ It is, of course, elementary that a final rule need not be identical to the original proposed rule. "The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *Trans-Pacific Freight Conference v. Federal Maritime Commission,* 650 F.2d 1235, 1249 (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).[3] However, "[w]here the change between the proposed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980), *cert. denied sub nom. Lead Industries Ass'n, Inc. v. Donovan,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).[4] "[I]f the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency,* 705 F.2d 506, 547 (D.C.Cir.1983).

A determination of whether notice was adequate in this case turns, then, on an examination of the notice which the Secre-

---

3. *See also National Cable Television Association v. Federal Communications Commission,* 747 F.2d 1503, 1507 (D.C.Cir.1984) ("An agency, after all, must be free to adopt a final rule not described exactly in the [notice of proposed rulemaking] where the difference is sufficiently minor, or agencies could not change a rule in response to valid comments without beginning the rulemaking anew."). *Cf. Small Refinery Lead Phase-Down Task Force v. United States Environmental Protection Agency,* 705 F.2d 506, 546 (D.C.Cir.1983) (The EPA, under the notice requirements of the Clean Air Act, 42 U.S.C. § 7607(d), "undoubtedly has authority to promulgate a final rule that differs in some particulars from its proposed rule."); *Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981) (The notice provisions of the Clean Air Act "do not require EPA to select a final rule from among the precise proposals under consideration during the comment period.").

4. *See also Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency, supra,* 705 F.2d at 547 ("This court has held, both under the APA and under Clean Air Act § 307(d), that the final rule must be a 'logical outgrowth' of the proposed rule."). *Cf. Sierra Club v. Costle, supra,* 657 F.2d at 352 (Under the Clean Air Act, "incremental changes are permissible so long as the final rule is a 'logical outgrowth' of the proposals highlighted and discussed during the notice and comment period.").

tary provided in relation to the final rule which was ultimately adopted. Prior to the first notice of proposed rulemaking ("NOPR") on December 28, 1979, the regulations called expansively for the coverage of *any part* of a service contract that was to be performed in the United States. The December 28, 1979, notice flagged no change in that coverage. *See* 44 Fed.Reg. 77036 (1979). In fact, this particular regulation appeared only as part of the entire set of Service Contract Act regulations set forth in 29 C.F.R. Part 4, which was reprinted in full in some forty pages of the Federal Register. Of especial importance, portions of the text of the full body of regulations were proposed to be changed, and those modifications were highlighted in the introductory pages of the NOPR. In addition, when the first "final" rule was published in January 1981, this regulation was retained in its prior, unamended form. *See* 46 Fed.Reg. 4320 (1981).

The August 14, 1981, notice of proposed rulemaking likewise provided no notice of any contemplated change. As in December 1979, the whole of 29 C.F.R. Part 4 was again set forth over some forty pages of the Federal Register. Proposed changes to the regulations were again indicated in the text, and once more the various proposed changes were highlighted in the introductory pages. But there was, as before, no indication that any change was proposed in the regulation interpreting performance "in the United States." Indeed, the first indication we have found from the agency itself of any contemplated modification was in the final rule itself, as adopted on October 27, 1983. *See* 48 Fed.Reg. 49736 (1983).

We find no notice, much less adequate notice, of the change to this regulation. The regulation in question was, to be sure, published in the Federal Register, but, as we have observed, it appears to have been published, along with many other unchanged regulations, simply to provide the full text of 29 C.F.R. Part 4 and thereby place in context the changes that were made in the text of the regulations— changes which *were* specifically discussed

in the notice. No indication is to be found that changes in any other particular regulations or in Part 4 in general were proposed. To the contrary, the clear impression from the notices of proposed rulemaking was that only the regulations specifically identified for possible modification would be changed and that the remainder of Part 4 would be left untouched. Under these circumstances, the modification cannot reasonably be seen as the "logical outgrowth" of a proposal that gave no indication of any change at all in this respect.

The Secretary attempts to remedy this obvious defect in the published notice by arguing that the parties had actual notice of the proposed change. The Seafarers' International Union and the Department of Defense, the Secretary argues, furnished comments on the regulation in question, and indeed it was the Department of Defense's suggestion that was ultimately adopted. *See* 48 Fed.Reg. 49736, 49744 (1983). From this state of affairs, the Secretary concludes that the lack-of-notice argument "should be rejected because *plaintiffs* had adequate notice as *they* commented on the proposed regulation, suggested that the final regulation take a different form than the initial proposal, and the final regulation simply evolved from *some* of the comments that were received on the proposed regulation." Appellee's Brief at 63 (emphasis added). Similarly, the Secretary argues, "[p]laintiffs can hardly complain now that they did not realize there could be a change from the proposed to the final regulations when *they* proposed a change...." *Id.* at 64 (emphasis added). And, "the comments received by [sic] parties *such as* plaintiff SIU and DOD show that the notice was sufficient to afford interested parties the opportunity to comment on the issues involved." *Id.* at 65 (emphasis added).

If Seafarers' International Union were the only plaintiff, the Secretary's argument might have merit. It would be passing strange for a party which had recommended in its comments that certain changes be made to a regulation later to

complain that it had inadequate notice of the possibility that the regulation might indeed be changed. But Seafarers' International was not the only plaintiff in this litigation; to the contrary, there are eight other plaintiffs-appellants. We cannot find, based on the comments of a solitary plaintiff-appellant, that the *"plaintiffs* had adequate notice as *they* commented," nor can we conclude that *"they* proposed a change."

■ Neither can we properly attribute notice to the other appellants on the basis of an assumption that they would have monitored the submission of comments. "As a general rule, [an agency] must *itself* provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment. The APA does not require comments to be entered on a public docket. Thus, notice necessarily must come—if at all—from the agency." *Small Refiner Lead Phase-Down Task Force v. United States Environmental Protection Agency, supra,* 705 F.2d at 549 (emphasis in original).[5] This principle seems particularly appropriate in the case at hand. Rather than there having been *"some ...* comments" received from parties *"such as* plaintiff SIU and DOD," there appear from the record to have been only two comments received on the regulation in question in a rulemaking of broad scope in which comments were received from some 1600 interested parties. *See* 48 Fed.Reg. 49736, 49736, 49744 (1983). It is both unreasonable and inconsistent with governing precedent to presume that these isolated comments would come to the notice of other parties.

We therefore conclude that the rule amending sections 4.110–.113, insofar as it adopted a "significant or substantial" standard for determining whether a contract was for services performed "in the United States," was adopted in violation of the procedures mandated by the notice and comment provisions of the APA.[6]

## III

We now turn to the substantive review of the remaining regulations. As the District Court correctly concluded, the standard for the review of administrative actions is generally determined by section 10(e)(2) of the APA, 5 U.S.C. § 706(2). Under that frequently invoked provision, courts are charged to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 5 U.S.C. § 706(2)(A), (C). "This 'arbitrary and capricious' standard of review is a highly deferential one, which presumes the agency's actions to be valid." *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981) (citations and footnotes omitted). *See also Motor & Equipment Manufacturers Ass'n v. Environmental Protection Agency,* 627 F.2d 1095, 1106 (D.C.Cir.1979) ("The Administrator must give reasoned consideration to the issues before him and reach a result which rationally flows from this consideration. If he does so, and presents that rational basis in his decision, then his decision is not arbitrary and capricious."), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980).

■ Not all agency determinations, of course, are due an equally high degree of deference. Agencies are of necessity called upon from time to time to interpret terms in the statute they are charged with implementing or enforcing. Ordinarily, such "administrative interpretations of statutory terms are given important but not controlling significance." *Batterton v.*

---

5. *See also Wagner Electric Corp. v. Volpe,* 466 F.2d 1013, 1019 (3d Cir.1972) ("The fact that some knowledgeable manufacturers ... responded[ ] is not relevant. Others possibly not so knowledgeable were interested persons within the meaning of 5 U.S.C. § 553.").

6. We do not have occasion to, and do not, opine on the substantive validity of such a regulation if proper notice consistent with APA requirements had in fact been provided.

*Francis,* 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). "[A] court is not required to give effect to an interpretative regulation[, but v]arying degrees of deference are accorded ... based on such factors as the timing and consistency of the agency's position, and the nature of its expertise." *Id.* at 425 n. 9, 97 S.Ct. at 2405 n. 9. In a word, when an agency interprets a statute, courts employ, in effect, a sliding scale of deference, taking into account a variety of deference-related factors such as those enumerated in *Batterton v. Francis, supra. See, e.g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *Center for Auto Safety v. Ruckelshaus,* 747 F.2d 1, 5 (D.C.Cir.1984).

▮ Circumstances do exist, of course, under settled principles of law when an agency's view of a statute is still to be reviewed under the traditional "arbitrary and capricious" standard. Where Congress *delegates,* explicitly or implicitly, to an administrative agency the authority to give meaning to a statutory term or to promulgate standards or classifications, the regulations adopted in the exercise of that authority enjoy "legislative effect," *see Batterton v. Francis, supra,* 432 U.S. at 425, 97 S.Ct. at 2405. *See also Chevron, USA, Inc. v. National Resources Defense Council,* — U.S. ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). As *Chevron*

teaches us, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, supra,* 104 S.Ct. at 2782 (footnote omitted).[7]

Determining the extent of deference in the case at hand therefore requires an examination of the authority conferred by Congress on the Secretary with respect to each regulation in question. In a word, the degree of deference afforded the agency's interpretation by the judiciary may vary depending upon the nature of the Secretary's specific authority and the nature and history of the regulation under scrutiny.

▮ We turn first to the Secretary's mandated two-step process for determining the prevailing wage in a locality. That regulation involves an interpretation of the term "the locality," as used in the statute. While the Secretary is given authority in 41 U.S.C. § 351(a)(1) to determine the prevailing wage in "the locality," the language of the statute seems best read as granting the authority to make the prescribed wage determination but not to define "locality" with near finality shielded by high deference. Under our approach, the Secretary's regulation interpreting "locality" as the location of each individual potential contractor constitutes an interpretive ruling that carries some weight and attracts some deference, but does not enjoy the highest de-

---

7. *See also United States v. Morton,* — U.S. ——, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984); *Schweiker v. Gray Panthers,* 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981).

Under the Supreme Court's decision last Term in *Chevron,* where Congress has delegated, *either expressly or implicitly,* to an agency the authority to interpret a statutory term, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 2782 (footnote omitted). *See also General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1566–67 (D.C.Cir.1984) (en banc) (citing *Chevron* in granting deference to an agency interpretation of the statute it administers). An implicit delegation is more difficult to recognize than an explicit delegation. However, such implicit delegations have been recognized where an unde-

fined statutory term, such as "extreme hardship," constitutes the operative standard to guide Executive Branch action, *see INS v. Jong Ha Wang,* 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981), and where the standard is one "of such inherent imprecision ... that a discretion of almost legislative scope was necessarily contemplated," *Association of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve,* 745 F.2d 677, 697 (D.C.Cir.1984) (involving the statutory standard of "closely related to banking"). We have not divined in the matters before us an implicit delegation of authority to the Secretary, but we need not plumb deeply into those matters inasmuch as we find in each instance, for reasons to be set forth hereafter, the Secretary's interpretation to be concordant with the statutory scheme and provisions.

gree of deference available under "arbitrary and capricious" review.[8]

An even clearer case of an interpretive ruling is the Secretary's determination that the successorship provisions for collectively bargained contracts would not apply when a successor contract was to be performed in a location other than that of the predecessor contract. There is no language in the statute indicating a delegation to the Secretary of the authority to make such a determination, and we therefore accord the Secretary's decision only some deference and weight.

■ We turn next to the Secretary's determination that the statute applies only to contracts the principal purpose of which is the provision of services; under the Secretary's approach, the Act would not apply to individual contract specifications for services in contracts whose principal purpose, taken as a whole, is not the provision of services. That determination, in our view, also constitutes an interpretive ruling. Defining the scope of the Act under which the Secretary operates is a question of statutory interpretation. While the Secretary must make such determinations in implementing the Act, no delegation has been given to the Secretary in this respect, and his determinations thus do not have legislative effect or scope.

In declining to view these regulations as legislative rules, we have not failed to take into account the authority granted to the Secretary by the incorporation in 41 U.S.C. § 353(a) of certain Walsh-Healey provisions. Those provisions confer upon the Secretary authority to make, amend and rescind rules and regulations necessary to carry out the provisions of the Act, and we

may assume that the rules and regulations so adopted would have legislative effect. Because no statute is self-executing, it is of course true that the Secretary will find it "necessary" to interpret the Act in order to implement it; we do not believe, however, that this bare necessity entitles the Secretary to characterize as legislative rules his interpretation of the congressionally delineated scope of the Act's provisions. Thus, as to the foregoing regulations, we will review the Secretary's actions as interpretive rules that are ordinarily granted less deference than rules of legislative scope and effect, which would attract great deference described in the well-worn articulations of the traditional "arbitrary and capricious" standard.

■ In contrast to these three regulations, the regulations with respect to timber sales, demolition/salvage, and engine rebuilding rest on the common premise that the statute applies only to contracts principally for services and not to bid specifications for services in contracts not in whole principally for service. That premise is properly reviewable as an interpretive rule. If it fails under this review, the three specific applications of the rule could not survive even under the most deferential standard. If on the other hand, this interpretive premise stands, then the specific determination that these three sorts of contracts are not principally for services would be precisely the type of factual determination that the Secretary's general authority to implement the Act would also delegate to him. His decisions would therefore enjoy the high protection of agency discretion

8. A characterization that might at first blush appear contradictory was employed by this court in *Building & Construction Trades' Department v. Donovan,* 712 F.2d 611 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). Regulations adopted by the Secretary of Labor to establish the method for determining prevailing wages under the Davis-Bacon Act were given legislative effect. However, the regulations concerned the mathematical procedure to be followed, and the language of the statute and the legislative history both clearly indicated that establishment of the meth-od was within the Secretary's authority. In the case at hand, the Secretary is to set wages "in accordance with prevailing rates for such employees in the locality." 41 U.S.C. § 351(a)(1). While the authority to determine prevailing rates is expressly granted and the power to classify employees may be impliedly granted, the authority to define "locality" does not appear to have been delegated. Certainly, the Secretary must interpret that term in implementing the statute, but that interpretation, under the approach we have described, does not have legislative effect.

under the traditional "arbitrary and capricious" standard.

▮ Finally, turning to the grant of an exemption to contracts for the service and maintenance of automated data processing, medical, scientific and business equipment, we find there the only clear example of a ruling to be given legislative effect, that is to say a legislative rule. The statute expressly grants the Secretary authority to grant exemptions in special circumstances "where *he* determines that such ... exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of this chapter to protect prevailing labor standards." 41 U.S.C. § 353(b) (emphasis added). The Secretary is expressly delegated the authority to grant the exemption and is required to make certain other determinations in order to do so. That grant and those determinations have legislative effect, are thus entitled to great deference under the "arbitrary and capricious" standard.

▮ While we have discussed the scope of review in general terms, as it would apply to the regulations in question, it must be noted that those regulations arguably involve changes, indeed reductions,[9] in the scope of the Act. However, the standard of review is not altered by the possibility of reduced coverage. An agency

faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... [T]his kind of flexibility and adaptability to changing needs and patterns ... is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). While a new interpretive rule might not merit the same deference due an interpretation of long standing, the fact that a regulation changes an interpretation does not in itself make the regulation unworthy of respect. It is still due some deference and weight in the court's interpretation of the statute. Similarly, a change in a legislative rule is still entitled to the highest deference accorded under the "arbitrary and capricious" standard.[10]

## IV

The Unions attack three of the new regulations with the same broad brush. They

---

9. While the new regulations appear to reduce the coverage of the Act, there is dispute between the parties over whether the Act, in application, ever enjoyed the scope that the prior regulations would seem to have given it.

10. Appellants also advance a general objection that the Secretary, in explaining and justifying the challenged regulations, relied on economic considerations and cost savings to the Government. They argue that Congress passed the Service Contract Act with the full knowledge that it would increase government costs and that cost savings is, therefore, not a factor upon which Congress intended the Secretary to rely in establishing regulations. Any such reliance would, under this analysis, be arbitrary and capricious. *See* Appellant's Brief at 21–24 (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856,

2867, 77 L.Ed.2d 443 (1983) ("Normally an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider....").

We may dismiss this objection, without passing on the validity of the argument, by noting that one of the premises does not comport with our view of what has occurred here. We do not agree that the Secretary relied on economic factors and cost savings in justifying and explaining the regulations. The publication of the final rule does not contain such analysis, which is found only in the Final Regulatory Impact and Flexibility Analysis ("FRIA") required under Executive Order 12991. The FRIA appears at 48 Fed.Reg. 49736, 49758–62 (1983) only after the regulations have been fully explained and justified at 48 Fed.Reg. 39736, 39736–58 (1983).

argue that the regulations excluding from the Act's coverage (1) individual service specifications in contracts not principally for the provision of services; (2) timber sales contracts; and (3) demolition/salvage contracts, must be set aside because each excludes for the first time contracts that have been covered continuously from the Act's adoption. Relying upon *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), the Unions argue that the Secretary is not free at this late date to embrace a new, more restrictive interpretation of the scope of this remedial legislation's coverage.

We find *Bell Aerospace* inapposite. In that case, a novel administrative interpretation by the NLRB (that certain managerial employees were covered by the National Labor Relations Act) not only conflicted with repeated Labor Board decisions of long standing, but was also in conflict with decisions of several Courts of Appeals. *See id.* at 288–89, 94 S.Ct. at 1768–69. Furthermore, the Supreme Court emphasized that Congress, in reenacting the statute, had relied upon the continued efficacy of the prior administrative interpretation. *See id.* at 283, 94 S.Ct. at 1766 ("[R]epresentatives from both the House and the Senate agreed that a specific provision [exempting supervisory personnel from the Act's coverage] was unnecessary since the Board had long regarded such persons as outside the Act"). That is not the case here.[11]

Appellants also argue that the new regulations conflict with congressional intent that the Act be given a broad, non-restrictive interpretation. This claim is not supported by legislative history discussing the specific provisions that are the subject of the regulations in question, but rather, appellants emphasize more general state-

ments in the legislative history calling for liberal and full coverage and generous, broad interpretations. *See* Appellants' Brief at 24–37. To be sure, "[t]he Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed." *Johnson v. United States*, 163 Fed. 30, 32 (1st Cir.1908) (Holmes, J.). It is also true, however, that "vague arguments as to the spirit of a ... statute have little worth." *Id.* at 31–32. Surely, the call for liberal, full, generous and broad interpretations cannot be taken as granting the Act universal scope. Universal scope could easily have been enacted by Congress, but the Act, by its terms, applies rather to contracts *principally* for the provision of services, with specific exemptions from coverage and with power vested in the Secretary to grant still other exemptions. While we may draw some guidance even from vague or general expressions of congressional intent, "[t]he starting point of our analysis is the language of the statute itself." *American Textile Manufacturers Institute v. Donovan*, 452 U.S. 490, 508, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981). Since "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive," *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), arguments as to the general intent or mind set of Congress cannot overturn the clear language of a specific provision.

We turn now to the three regulations appellants challenge in this group, as well as one further regulation susceptible to a similar analysis.

11. Appellants attempt to bring the regulations in question under the umbrella of *Bell Aerospace*. They note that the regulations have been in force since soon after the Act's adoption. Since that time, the Act has been amended twice to close gaps in its coverage. Appellants thus argue that those amendments constitute a ratification of the original regulations, and that to alter the regulations now would conflict with the will of Congress. However, appellants have come forward with no indication, and we have found none, that Congress even considered the regulations in question when it amended the Act. What we have here is merely non-action; "[n]on-action by Congress is not often a useful guide...." *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983).

## A

██ Under the new regulations, the Service Contract Act applies only to contracts *principally* for the provision of services. It does not apply, as it once did, to separate line items for the provision of services in contracts not principally for services as a whole. The fact that this interpretation or definition is a change in the regulations does not speak against it, but we need not grant the same deference and weight that would be due a longstanding interpretation adopted near the time the statute was enacted. *See, e.g., Batterton v. Francis, supra,* 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9 ("Varying degrees of deference are accorded to administrative interpretation, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise."); *NLRB v. Bell Aerospace, supra,* 416 U.S. at 274–75, 94 S.Ct. at 1762 ("[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency...."). Nonetheless, our independent analysis of the statutory language confirms the Secretary's view.

The statute provides for coverage of "[e]very contract (and any bid specification therefor) ... the principal purpose of which is to furnish services...." 41 U.S.C. § 351(a). While the parenthetical reference to bid specifications might be construed to bring with the Act individual contract provisions for services in non-service contracts, that reading cannot stand under careful examination. The parenthetical phrase is more reasonably interpreted as requiring that the wage requirements, etc., be spelled out in the invitations to bid.

██ The statutory language itself indicates to us that the Act applies only to contracts principally for services, not to individual contract provisions for services in contracts not having as their principal purpose the provision of services. We observe in this regard that the Act covers contracts and bid specifications *therefor*, rather than *thereof*. While "thereof" would indicate the inclusion of an individual contract provision, the use of "therefor" cuts in favor of interpreting the parenthetical as applying to invitations to bid. Given the plain thrust of the statutory language, only clear congressional intent to the contrary would warrant our interpreting the statute as appellants wish.[12] *See Consumer Product Safety Commission v. GTE Sylvania, Inc., supra.* As discussed above, we do not find in general expressions as to "generous" and "liberal" coverage a clear expression of intent contrary to the language of the specific provision in question. We are, accordingly, in agreement with the Secretary's interpretation of the statute and find that the adoption of the regulation implementing the "principal purpose" test was within his authority.

## B

██ Once it is concluded that the Act applies only when the *principal* purpose of a contract is for services, the nonapplicability of the Act to contracts for the sale of timber becomes clear. This type of contract may require the building of temporary roads and the provision of services in controlling soil erosion and preventing fires; however, if the principal purpose of the contract is the sale of timber by the Government, any individual contract provision for services would not be within the scope of the Act.

The essentially factual determination that timber sales contracts are not principally for the provision of services would appear to be delegated to the Secretary as part of his general authority to adopt rules implementing the Act. We, accordingly, review the adoption of a rule pursuant to

---

12. We recognize that agencies have not been consistent in their use of the term, "bid specification." At times it is used to refer to the individual requirements of a contract. *See, e.g.,* 49 Fed.Reg. 25872, 25874 (1984) ("separate bid specifications (*i.e.,* line items for specific work in a contract)"). At other times "bid specifica-tion" clearly refers to invitations to bid. *See, e.g.,* 48 Fed.Reg. 19532, 19535 (1983) ("corrections shall be included in any bid specifications containing the wage determinations"). While there may be ambiguity elsewhere, we find no difficulty in interpreting the clause in the present context.

such delegated responsibility under the "arbitrary and capricious" standard. Employing that standard, we find no indication of any irregularity in the Secretary's decision.

The agency record takes into account the comments received and sets forth adequate reasoning for adoption of the rule. *See* 48 Fed.Reg. 49736, 49751–52 (1983). Furthermore, the Secretary recognized some potential for an overly broad interpretation of the new regulation and took steps to forestall that development. The regulations as adopted provided that contracts for clearing land, *e.g.*, to develop recreational space or remove diseased or dead timber, when the principal purpose of the Government is not the sale of timber, would remain covered by the Act. *See* 48 Fed.Reg. 49736, 49752 (1983). We thus conclude that the Secretary's determination that timber sales contracts do not have the provision of services as their principal purpose was well reasoned, and since the Secretary's principal-purpose test is in accordance with law, the adoption of the regulation exempting timber sales contracts was properly within his authority.

### C

■■■ Much the same may be said of demolition/salvage contracts. If the principal purpose of a contract is not the clearing of the land but is, rather, the sale of the salvaged materials, then under the principal-purpose test, the contract would not be within the scope of the Act.

While demolition contracts were previously covered under the old regulations, the General Services Administration appears, in practice, not to have been applying the Act to such contracts. 48 Fed.Reg. 49736, 49745 (1983). The new regulation would establish a guideline whereby certain demolition contracts would be covered, when such coverage is consistent with the general purpose of the Act.

Once again, the Secretary considered the comments offered and provided adequate reasoning for adoption of the rule. His analysis was sufficiently extensive to recognize that a conflict may arise in applying the principal-purpose test. That is to say, the principal purpose of the Government as to a particular contract may be the clearing of land, whereas the principal purpose of the contractor may be to obtain the salvaged material. In such a case, the Secretary's discussion of the rule states that it is the principal purpose of the Government that provides the governing standard. Application of the principal-purpose test, which we have already accepted in the main, to this area of government contracts was well reasoned, was neither arbitrary nor capricious, and was well within the Secretary's authority.

### D

The regulation exempting the type of engine and equipment overhaul and modification which is so extensive as to constitute remanufacturing may also be justified under the principal-purpose test; however, a somewhat more extensive analysis on our part is required. As we have seen, the Service Contract Act provides a specific exemption for work done in accordance with the Walsh-Healey Act. *See* 41 U.S.C. § 356(2). However, the distinction between service contracts and Walsh-Healey contracts, particularly in the area of engine and heavy equipment overhaul and rebuilding, has not in practice been clear. Under the prior regulations, workers involved in disassembly or overhaul of engines or equipment would have been covered under the Service Contract Act, while workers involved in engine rebuilding would be within the scope of Walsh-Healey. *See* 48 Fed.Reg. 49736, 49746 (1983). This dual coverage led to difficulty and confusion, especially where manufacturers used the same employees to rebuild engines as had disassembled them. That confused situation led to variations in application and, ultimately, to an exemption for Department of Defense engine overhaul and modification contracts. *See id.*

■■■ The new regulations eliminate this confusing situation of dual coverage. Guidelines are established by the regulations to determine at what point work on

an engine or other equipment ceases to be repair and becomes remanufacture. *See* 29 C.F.R. § 4.17, 48 Fed.Reg. 49736, 49780 (1983). Under the new regulations, repairs would still be service work and would be covered under the Service Contract Act. Remanufacture, like original manufacture, would be covered under the Walsh-Healey Act. During the comment period, an objection was made that it would not be possible to foretell, before tearing down and inspecting the equipment, whether the work required would be extensive enough to constitute remanufacture. That objection is not without force. It cannot be denied that the boundary between repair and remanufacture is not entirely clear; however, in our view the Secretary has made a reasoned attempt, using criteria developed from tax law distinctions between manufacture and service, *see* 48 Fed.Reg. 49736, 49746 (1983), to establish guidelines for distinguishing between the two.

Given our acceptance of the principal--purpose test and the delegated power to the Secretary to make rules implementing the Act, the regulation in question must be upheld unless its adoption was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Since the adoption of the regulation was well reasoned and not an abuse of discretion, appellants must fall back on challenging the adoption as being not in accordance with law. In addition to the general arguments already rejected, appellants advance two arguments addressed specifically to this regulation.

First, appellants point out that in *Curtiss-Wright Corp. v. McLucas*, 364 F.Supp. 750 (D.N.J.1973), *aff'd on reh'g*, 381 F.Supp. 657 (1974), a case regarding the applicability of the Service Contract Act to engine rebuilding, the court deferred to the Secretary of Labor to make determinations as to coverage. In response, the Secretary adopted the dual approach of the old regulations. In contrast to appellants' interpretation, however, *McLucas* cannot reasonably be read to *require* a dual approach. The court deferred to the Secretary, and in the court's view, the Secretary was free either to adopt the regulation he had chosen or some other rule. *See id.* at 769 ("Whether or not a particular Government contract is subject to the Service Contract Act is a determination ultimately to be made by the Secretary of Labor on the basis of his regulations and statutory experience. Once made, his determination is not judicially reviewable."). The old regulation was not required by law, and since the Secretary has, as we have seen, the authority to make, amend and rescind rules, he may adopt the new regulation without conflicting with the *McLucas* decision.

Appellants' second argument focuses upon the specific exemptions for Walsh-Healey Act *work* and Davis-Bacon *contracts* set forth in 41 U.S.C. § 356. Section 356 exempts several types of "contracts," but it only exempts Walsh-Healey "work." Appellants argued below that, in view of this language, the Secretary could not conclude that contracts *principally* for remanufacturing are covered by the Walsh-Healey Act rather than the Service Contract Act. The District Court rejected this argument, noting that "[b]y the statute's terms ... a *contract* the whole purpose of which is Walsh-Healey work would not need to be listed in order to be excluded from the SCA, since its principal purpose is not the provision of services. The language of section 7(2), 41 U.S.C. § 356(2), thus simply deals with manufacturing aspects to service contracts." 582 F.Supp. at 1023 (emphasis in original). Appellants find this reasoning lacking. They emphasize that the same may be said for Davis-Bacon contracts, yet Congress exempted Walsh-Healey *work* but construction *contracts*. They argue that a distinction clearly delineated in the exemption should not be rendered nugatory, since all parts of a statute should, if possible, be given effect.

If it were clear that Congress intended to distinguish the scope of the two exemptions by use of the words "work" and "contract," appellants' argument would have great force. However, that intent is not at all clear. First, it should be noted

that the difference in wording is not solely in the use of "work" as opposed to "contract." One exemption is for "any contract ... for construction, alteration and/or repair, including painting and decorating of public buildings or public works," while the other is for "any work required to be done in accordance with the provisions of the Walsh-Healey Public Contracts Act." 41 U.S.C. § 356. Furthermore, both the House and Senate Reports accompanying the bill indicate that the Walsh-Healey and Davis-Bacon exemptions are identical. *See* H.R.Rep. No. 948, 89th Cong., 1st Sess. 5 (1965) ("Section 7 exempts from the application of the act—(1) Contracts covered by the Davis-Bacon Act. (2) Contracts covered by the Walsh-Healey Public Contracts Act."); S.Rep. No. 798, 89th Cong., 1st Sess. 2 (1965) U.S.Code Cong. & Admin. News p. 3738 ("There are certain specific exemptions from coverage listed in section 7 including contracts covered by the Davis-Bacon Act, the Walsh-Healey Public Contracts Act ..."). Given the fact that the use of "work" rather than "contract" occurred in a different context from that in which "contract" had been used for construction work, together with the legislative history indicating no difference in coverage, we decline to place decisive emphasis on this distinction. We cannot conclude the adoption of the new regulation to have been not in accordance with law. The Secretary was, we hold, within his authority in adopting the rule.

## V

We turn now to the role of "locality" in wage determinations. The contested regulations affect that role both in general wage determinations and in the requirement that successor contracts include a predecessor contract's wage, when that wage was collectively bargained.

## A

With regard to general wage determinations, the statute requires that the Secretary determine the wages prevailing in "the locality." *See* 41 U.S.C. § 351(a)(1).

The new regulations address the situation in which the locality of performance is unknown at the time of bidding—that is, when the contract may be performed at a location of the contractor's choosing. The old regulations did not specifically address this situation, but the administrative practice had been to make a wage determination for each possible location, when they could be determined, or a nationwide composite wage determination, when the bidders had not yet been ascertained or were too numerous to allow individual determinations. 48 Fed.Reg. 49736, 49738 (1983). The new regulation would establish a two-step process—first, the identification of the potential bidders and their localities, followed, second, by a wage determination for each locality. Where this procedure would be impractical, composite localities would be permitted. 29 C.F.R. §§ 4.3, 4.4, 4.53; 48 Fed.Reg. 49736, 49764–65, 49773–74 (1983).

Appellants object that the new two-step approach reduces the protection to workers intended by Congress, inasmuch as low wage regions of the country will enjoy a competitive advantage over those regions in which wage levels are higher. They prefer a single, nationwide wage determination, a preference they claim is supported by the legislative history and pertinent case law.

To substantiate their argument, appellants rely on the fact that in a 1964 bill, similar to the Service Contract Act of 1965 and introduced by Representative O'Hara, the sponsor of the Act, the word "locality" was not used; instead, determinations were to be made "in the city, town, village or other civil subdivision of the state where the work is to be performed." Appellants' Brief at 50 (citing *Service Contracts Act of 1963: Hearings on H.R. 1678 and H.R. 6088 Before the Special Subcomm. on Labor of the House Comm. on Education and Labor,* 88th Cong., 2d Sess. 2 (1964)). In addition, appellants point to various indicia of congressional intent that "locality" be interpreted in a realistic and flexible manner. Appellants' Brief at 51–52 (citing

S.Rep.No. 1798, 89th Cong., 1st Sess. 1–2 (1965)).

██ Even accepting appellants' representations as to the legislative history and statements of intent, we are unable to make the long leap required to conclude that wage determinations must be nationwide. In our view, the change in wording from the 1964 bill to that adopted in the 1965 Act and of the language in the Senate Report reflects a realization that the relevant geographical area in which wages may be affected by a government contract is actually more in the nature of a metropolitan area than a legally defined civil subdivision. *See Descomp, Inc. v. Sampson, supra*, 377 F.Supp. at 265 ("The 'flexibility' referred to in the hearings ... was to enable the Secretary to determine localities for wage level determinations which would not be bound by municipal or state boundaries.") (citing *Service Contract Act of 1965: Hearing on H.R. 10,238 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare*, 89th Cong., 1st Sess. 12–13); *see also Southern Packaging & Storage Co. v. United States*, 458 F.Supp. 726, 733 (D.S.C. 1978) (quoting *Descomp* ), *aff'd*, 618 F.2d 1088 (4th Cir.1980). In *Descomp*, the court found that "Congress' intent to grant the Secretary more latitude in determining the locality for the purpose of wage level determinations sheds no light on the issue ... [of] whether 'locality' refers to the location of the Government installation or to where the work is to be actually performed." 377 F.Supp. at 265. Similarly, we find no more support in any evidence of congressional intent for the conclusion that nationwide wage determinations are required.

Appellants point with favor to the approach with respect to wage determinations formulated in *Mitchell v. Covington Mills, Inc.*, 229 F.2d 506 (D.C.Cir.1955), *cert. denied*, 350 U.S. 1002, 76 S.Ct. 546, 100 L.Ed. 865 (1956). There, a nationwide wage determination by the Secretary of Labor under the Walsh-Healey Act was upheld. However, the court in that case did not conclude that a nationwide determi-

nation must inexorably follow from the operative statutory language; rather, the court simply held that the Walsh-Healey Act did not *prohibit* the Secretary from making a nationwide determination. Of relevance to our inquiry, the appellants correctly note that the Secretary's decision under Walsh-Healey was based, at least in part, on his finding that only an industry-wide minimum would serve the purposes of the statute by virtue of the fact that competition in the textile industry was nationwide. *Id.* at 508. The court further observed that individual regional determinations would freeze the competitive advantage of those firms operating in low wage communities. *Id.* However, the court relied equally on the fact that, in the textile industry, there was frequently only one business enterprise per locality, and whatever wages that firm paid would be, by definition, the prevailing wage in that locality. *Id.* No indication has been given that this peculiar characteristic obtains in the service industry. Finally, any authority *Mitchell* might have held for the case at hand is diminished by the fact that an interpretation of the language of the Walsh-Healey Act need not carry over to the Service Contract Act. *See Southern Packaging & Storage Co. v. United States*, 618 F.2d 1088, 1091 (4th Cir.1980) ("Locality as used in the Walsh-Healey Act ... is not synonymous with locality as used in the Service Contract Act." (citations omitted)).

We interpret "locality" to give it its ordinary common meaning. *See United States v. Rodgers*, —— U.S. ——, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984) (noting an " 'assumption that the legislative purpose is expressed in the ordinary meaning of the words used' " (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962))); *Malat v. Riddell*, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) (" 'the words of statutes ... should be interpreted where possible in their ordinary, everyday senses' " (quoting *Crane v. Commissioner*, 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947))). The statute requires that wages under a service contract be those prevailing in the

locality. To read "locality" to mean "Nation" conflicts squarely with the term's ordinary, common meaning.[13]

 The clear language of the statute thus supports the Secretary's regulations. As we have previously indicated, only clearly expressed, contrary congressional intent contemporaneous with the statute's enactment would suffice to imbue that language with an alternative meaning. *See Consumer Products Safety Comm'n v. GTE Sylvania, Inc., supra,* 447 U.S. at 108, 100 S.Ct. at 2056 (1980). We find no clear intent contrary to the statute's language and, accordingly, hold that the rule is in accordance with law.[14]

**B**

As a result of the 1972 amendments to the Service Contract Act, collectively bargained wage rates have some effect on the wages to be paid under successor contracts. The Act provides that the Secretary is to make a wage determination for service employees "in accordance with prevailing rates for such employees in the locality, or, where a collective bargaining agreement covers such service employees, in accordance with the rates for such employees provided for in such agreement...." 41 U.S.C. § 351(a)(1). Section

4(c) of the Service Contract Act further states that

> [n]o contractor ... under a contract which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay under such contract less than the wages and fringe benefits ... provided for in a collective-bargaining agreement ... to which such service employees would have been entitled if they were employed under the predecessor contract.

41 U.S.C. § 353(c).[15] At issue is whether these portions of the Act apply when the successor contract is to be performed in a different locality from that in which the predecessor was performed.

Under the old regulations, the successor contract provisions were applicable to any contract providing substantially the same services *for* the same location, *i.e.,* for the same procuring facility; this was so irrespective of the successor contract's place of performance. *See* 48 Fed.Reg. 49736, 49756 (1983). The new regulations would apply only when the successor contractor would provide substantially the same services *in* the same locality. *See* 29 C.F.R. § 4.163(i), 48 Fed.Reg. 49736, 49789–90 (1983).[16] Appellants contest this reduction in the applicability of the successorship

---

**13.** Support for our position may be drawn from *Southern Packaging & Storage Co. v. United States, supra.* There, an attempt by the Secretary to issue a nationwide determination, under the Service Contract Act, was held to be contrary to law. The *Southern Packaging* court did note that nationwide determinations might be permissible for "the rare and unforeseen service contract which might be performed at locations throughout the country." 618 F.2d at 1092 n. 7. The court did not, however, decide the point.

Further support is found in *Descomp, Inc. v. Sampson, supra.* There, "locality" was interpreted as the location of the contractor. However, the alternative interpretation under consideration was the location of the contracting agency. While that court's conclusion is in accord with ours, the issue addressed differed somewhat from that presented here.

**14.** The Unions urge us to consider, as evidence of congressional intent, various statements made long after the Act's passage. *See* Appellants' Brief at 55–56. Postenactment comment,

however, generally does not serve as a reliable indicator of the meaning of a statutory text, *see Regional Rail Reorganization Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974)—especially where, as here, the lapse of time between enactment and comment is substantial and the remarks at issue neither prompt nor introduce specific congressional action.

**15.** The collectively bargained wage must have been the result of arms-length negotiations and need not be applied if the Secretary finds it to be substantially at variance with wages and fringe benefits that prevail in the locality for services of a similar character.

**16.** The regulations also provide that, once a successor contract subject to the successorship provisions is awarded, the provisions continue to apply, even if the successor contractor later changes the place of performance or subcontracts out the work to a subcontractor in a different locality.

provisions as being other than in accordance with law.

We start, once more, with the language of the statute itself. Turning to that language, we find considerable ambiguity. Under 41 U.S.C. § 351(a)(1), the Secretary is to make a wage determination, "where a collective bargaining agreement covers such service employees, in accordance with the rates for such employees provided for in such agreement...." This language appears open to more than one interpretation. It is not at all clear to what group "such employees" refers.

This ambiguity also appears in section 353(c). There, the successor-contract employees are entitled to the wages "to which such service employees would have been entitled if they were employed under the predecessor contract." 41 U.S.C. § 353(c). Here, the ambiguity revolves around the phrase, "would have been entitled." That phrase too lends itself to more than one interpretation. It is not clear what group is accorded the protection of the predecessor contract.

Since we find no clear guidance in the language of the statute, we must look to other evidence of congressional intent. The strongest piece of legislative history in support of the Unions' position is found in the *Subcomm. on Labor-Management Relations of the House Comm. on Education and Labor, 94th Cong., 1st Sess., Congressional Oversight Hearings: The Plight of the Service Worker Revisited* (Comm. Print 1975). There, in discussing the meaning of "locality" in § 351(a)(1), the subcommittee observed that "§ 4(c) requires that the wages and fringe benefits, including prospective increases contained in a predecessor's collective bargaining contract, form the basis for the Secretary's determination for successor contracts whether performed at the same or at a different site." *Id.* at 10.

Further buttressing the AFL-CIO position is the report of the *Oversight Hearings on Service Contract Act of 1965 as Amended Before the House Special Subcomm. on Labor of the House Comm. on Education and Labor, 93d Cong., 2d Sess., on H.R. 14371* (Comm.Print 1974). There, the subcommittee cited with approval a Labor Department review of GAO recommendations. The GAO report had concluded: "Unless and until the statute is changed the Secretary of Labor would not appear to have authority to do otherwise than to adopt, for wage determinations applicable to a successor contract to be performed at the contractor's business, the wages and fringe benefits provided under a collective bargaining agreement for employees performing the same services for the same Federal procurement facility under a predecessor contract, *irrespective of the place of performance of the predecessor contract work." Id.* at 229 (emphasis added).

We again note that postenactment comments generally are not reliable indicators of the meaning of a statutory text. *See supra* note 14. Hence, even the Unions' strongest offering provides little support for their position.

In contrast, support for the Secretary's position is found in the section-by-section analysis of the 1972 amendments to the Act set forth in the Senate Report accompanying the bill. There, 41 U.S.C. § 353(c) is described as "explicat[ing] the degree of recognition to be accorded collective bargaining agreements covering service employees, in the predetermination of prevailing wage and fringe benefits for future such contracts for *services* at the *same location."* S.Rep. No. 1131, 92d Cong., 2d Sess. 4 (1972) U.S.Code Cong. & Admin. News p. 3536 (emphasis in original). Recognizing that this explication provides support for the Secretary's argument, the AFL–CIO responds that the Report was not addressing the situation at issue in the present litigation, *see* Appellants' Reply Brief at 17. It is, in fact, true that this statement does not appear in the analysis of the section adding section 353(c) to the Act. But, the statement is contained within the section-by-section analysis and discusses the interaction of section 353(c) with section 351. It is, in our view, probative

evidence of the intent of Congress in amending the Act.

The Secretary finds further support in two passages from the Congressional Record. Representative Ashbrook is quoted as saying that the bill "merely requires that a successful bidder cannot pay less to employees than they were receiving from their former employer pursuant to a contract with respect to wage and fringe benefits." 118 Cong.Rec. H27137 (daily ed. Aug. 7, 1972). From that statement, it would appear to be the speaker's view that the Act's coverage was clearly limited to the same locality. The same view seems to be expressed in a statement by Senator Gurney [17] included in 118 Cong.Rec. S31281 (daily ed. Sept. 19, 1972) and in the *Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess., Legislative History of the Service Contract Act Amendments of 1972,* at 72–73 (Comm.Print 1972). In that statement, Senator Gurney remarks: "The bill is a simple one. It merely requires that a successful bidder on a service contract cannot pay employees less than they were receiving from their former employer unless his wages are out of line."

The historical setting in which this amendment was adopted lends further support to the Secretary's view. Comments in the course of Congress' consideration of the measure indicate that the provision was the result of a specific episode at the Kennedy Space Center.[18] Service workers on a particular contract at the Center had a collective bargaining agreement with the service contractor. When the government contract was relet at the expiration of the old contract, the incumbent contractor was underbid, and a new, non-union contractor was selected. The service workers who had enjoyed the fruits of the labor agreement with the now-ousted contractor were then faced with large pay cuts when the successor contractor took over, even though the same work was being performed. In the wake of this experience at the Kennedy Space Center, congressional concern at the time appears to have been directed at protecting workers employed under a predecessor contract and assuring that they would not be faced with pay cuts when a new government contractor was chosen to perform the same work. If that were indeed the intent, restricting the successor rule to successor contracts to be performed in the same locality, as the revised regulation provides, would be in accordance with law.

▇ Given the historical setting of the 1972 amendments and the persuasive evidence of congressional intent provided by the contemporaneous section-by-section analysis in the Senate Report, we conclude that the 1972 amendment was intended to protect the collectively bargained wages in the locality of the predecessor contractor. The Secretary's determination—that the successorship rule does not apply when a successor contract is to be performed in a different locality—is therefore in accordance with law.

## VI

▇ Finally, we reach the eighth and last of the contested regulations. As we have seen, the Secretary may grant an exemption from the requirements of the Act "in special circumstances where he determines that such ... exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purposes of this chapter to protect prevailing labor standards." 41 U.S.C. § 353(b). *See supra* p. 335. The challenged regulation grants such an exemp-

---

**17.** Senator Gurney was cosponsor of Senate Bill S. 3827, identical to H.R. 15376, that incorporated the 1972 amendments. *See* S.Rep. No. 1131, 92d Cong., 2d Sess. (1972).

**18.** *See* Remarks of Senator Gurney *quoted in Service Contract Act Amendments, 1972: Hearings on S. 3827 and H.R. 15376 Before the Sub-*

*comm. on Labor of the Senate Comm. on Labor and Public Welfare,* 92d Cong., 2d Sess. 32 (1974); 118 *Cong.Rec.* S31281–82 (daily ed. Sept. 19, 1972). Senator Gurney also noted the near occurrence of a similar incident at Patrick Air Force Base near the Kennedy Space Center.

tion for contracts for the maintenance and repair of certain automated data processing, scientific and medical, and office and business equipment. *See* 29 C.F.R. § 4.123(e), 48 Fed.Reg. 49736, 49782 (1983). However, the exemption applies only where (1) the equipment itself is commercially available; (2) the services are provided at catalog or market prices; and (3) the compensation plan for workers on government contracts is the same as for employees working on commercial contracts. *See id.*

Inasmuch as the power to grant exemptions is expressly delegated to the Secretary on the condition that he make certain determinations, our review of those determinations is limited to assuring that they are not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Secretary determined that the exemption in question was necessary in order to avoid the serious impairment of government business. In particular, the Secretary took cognizance of past refusals of service contractors in this industry to accept contracts covered by the Service Contract Act and the necessity that the Government, to carry on its functions, enter into maintenance contracts for these types of equipment. *See* 48 Fed.Reg. 49736, 49750 (1983). The Secretary also determined that the exemption is

> in accordance with the remedial purposes of the Act because the affected employees are relatively highly paid pursuant to complex merit pay systems and because the nature of the industry ... is such that price competition based on labor costs and concomitant wage abuses are highly unlikely to occur. Because the protections of [the Service Contract Act] are therefore not necessary to these workers and because, by virtue of the nature of the industry and its merit pay plan, compliance with [the Service Contract Act] would disrupt the merit pay system and staff assignments, thereby disrupting the workers as well as the industry, it is also found to be necessary

and proper in the public interest to grant these exemptions.

*Id.*

Appellants contend that the Secretary has not shown that the exemption is "necessary and proper in the public interest." They address the unwillingness of service contractors to deal with the Government as the major support for such a finding and argue that it is "insufficient as a matter of law to justify the exemption." Appellants' Brief at 42. The Unions characterize the exemption as, in effect, the Secretary's submission to an industry boycott and argue that contractors cannot properly be exempted from the statute's strictures merely because they prefer not to be subject to the law. *Id.* at 42–43.

This approach must fail. First of all, the evidence of refusals to deal was relied upon by the Secretary not to show that the exemption was "necessary and proper in the public interest," but rather to show that it was necessary "to avoid the serious impairment of government business." *See* 48 Fed.Reg. 49736, 49750 (1983). The evidence does, in fact, support this conclusion. Furthermore, whatever effect viewing the problem as a boycott might have on the grant of an exemption, the Secretary did not indicate that a boycott would in fact occur but simply that individual potential contractors might choose not to deal with government agencies.

In addition to reaching his conclusions with respect to likely impairment of government business, the Secretary made other determinations with respect to whether an exemption was "necessary and proper in the public interest." Whether his determinations are supported or are adequate for the grant of an exemption might be debated, but such a determination is not necessary under the statute. Under the statute, the Secretary must determine that the exemption is "necessary and proper in the public interest *or* to avoid the serious impairment of government business." 41 U.S.C. § 353(b) (emphasis added). The Secretary has made a sufficient showing with regard to the second disjunct, namely the

354

impairment of government business; whether he has also demonstrated the first disjunct thus becomes irrelevant.

The Secretary must also determine that the exemption is in accord with the statute's remedial purposes of protecting prevailing labor standards. While high pay within the industry alone might not satisfy the requirement,[19] the remaining rationale offered by the Secretary, part of which is quoted above, does. The remedial purpose to be protected is stated in the section granting the power to exempt. That purpose is to protect prevailing labor standards. Furthermore, it is clear from the House and Senate Reports accompanying the original bill, H.R.Rep. No. 948, 89th Cong., 1st Sess. (1965); S.Rep. No. 798, 89th Cong., 1st Sess. (1965), that the purpose of the Act was to prevent service contractors from obtaining government contracts by offering a low bid based on substandard wages. The regulation as adopted insures that service workers on this sort of government contract will be paid at the same rate as workers on non-government contracts. Thus, under the new regulations, a contractor in this industry cannot obtain a competitive advantage by offering a wage lower than that which is standard in its contracts with the private sector.

### VII

In summary, we affirm the decision of the District Court with respect to all regulations save for the amendment to 29 C.F.R. §§ 4.110–.113 establishing a "significant or substantial standard" to determine whether a contract is performed in the United States. The portion of the judgment below affirming the Secretary's adoption of that regulation is vacated by virtue of the Secretary's failure to comply with the procedural requirements of the Administrative Procedure Act.

*Judgment accordingly.*

19. Appellants emphasize that the 1976 amendment to the Service Contract Act was intended to extend coverage of the Act to "white collar" workers and that this evidences an intent that

workers be covered by the Act despite high wages. We need not determine this issue, since the other support offered by the Secretary is adequate to buttress his determination.